UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| MIKE GODSEY | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Cause No. 1:14-cv-297 |
|  | ) |  |
| CAROYLN W. COLVIN, | ) |  |
| Acting Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Mike Godsey, on September 24, 2014. For the following reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Mike Godsey, filed an application for Disability Insurance Benefits and Supplemental Security Income on February 6, 2013, alleging a disability onset date of October 31, 2007. (Tr. 16). The Disability Determination Bureau denied Godsey's application on March 27, 2013, and again upon reconsideration on June 14, 2013. (Tr. 16). Godsey subsequently filed a timely request for a hearing on July 22, 2013. (Tr. 16). A hearing was held on November 14, 2013, before Administrative Law Judge (ALJ) Terry Miller, and the ALJ issued an unfavorable decision on December 19, 2013. (Tr. 16–26). Vocational Expert (VE) Marie N. Kieffer testified at the hearing. (Tr. 16). The Appeals Council denied review, making the ALJ's decision the final decision of the council. (Tr. 6–9).

The ALJ found that Godsey met the insured status requirements of the Social Security Act through March 31, 2011, but not thereafter. (Tr. 18). At step one of the five step sequential

analysis for determining whether an individual is disabled, the ALJ found that Godsey had not engaged in substantial gainful activity since October 31, 2007, his alleged onset date. (Tr. 18). At step two, the ALJ determined that Godsey had the following severe impairments: low back pain with degenerative changes, bilateral foot pain/foot neuromas, chronic headaches, depression, posttraumatic stress disorder, and cognitive disorder. (Tr. 18). At step three, the ALJ concluded that Godsey did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 19).

In determining whether Godsey had an impairment or combination of impairments that met the severity of one of the listed impairments, the ALJ considered Listing 1.04, spine disorders, and Listing 12.04, affective disorders. (Tr. 19). In finding that Godsey did not meet Listing 12.04, the ALJ considered the Paragraph B criteria for mental impairments, which required at least two of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

(Tr. 19). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 19–20).

The ALJ found that Godsey had moderate restrictions in daily living activities. (Tr. 20). Godsey reported that he could dress himself, tie his shoes, manipulate buttons, pick up small items, prepare meals, drive a car, and clean. (Tr. 20). However, Godsey testified that dressing and bathing himself worsened his back pain, that he could not sit still while watching television, and that he needed to lean on the cart while shopping. (Tr. 20). Despite Godsey's difficulties, the ALJ found that the medical evidence supported only moderate restrictions in daily living

2

activities. (Tr. 20). The ALJ also found that Godsey had moderate difficulties in social functioning. (Tr. 20). He indicated that he had felt depressed for two years, that he felt fatigued most days, that he had low self-esteem, and that he had a negative outlook. (Tr. 20). Additionally, Godsey stated that bad news caused him to become angry and agitated instantly and that he did not have a social life. (Tr. 20). The ALJ concluded that the medical evidence did not support a marked limitation in social functioning. (Tr. 20).

The ALJ found that Godsey had moderate difficulties in concentration, persistence, or pace. (Tr. 20). Dr. Fervida found that Godsey had a significant impairment in memory ability. (Tr. 20). Additionally, he concluded that Godsey would have significant difficulty remembering visually presented information and some difficulty remembering auditory information presented illogically. (Tr. 20). Although the ALJ found that Godsey's recognition ability was significantly impaired, he concluded that the evidence did not support a marked limitation. (Tr. 20). Moreover, the ALJ determined that Godsey had not experienced any extended episodes of decompensation. (Tr. 20). The ALJ concluded that Godsey did not satisfy the Paragraph B criteria because his mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration. (Tr. 20). Additionally, he found that Godsey did not meet the requirements for Paragraph C. (Tr. 20).

The ALJ then assessed Godsey's residual function capacity (RFC) as follows:

> the claimant has the residual function capacity to perform "light" work as defined in 20 CFR 404.1567(b) and 416.967(b), with the following additional restrictions: only occasional climbing of ramps, stairs, ladders, ropes, and scaffolds, as well as occasional stooping, kneeling, crouching, and crawling. He can do frequent balancing. In addition, the claimant should avoid concentrated exposure to wetness, loud noise, and bright/flashing lights. The claimant should avoid hazards including operational control of dangerous moving machinery, work at unprotected heights, and work around slippery/uneven/moving surfaces. Mentally, the

> individual cannot understand, remember, or carry out detailed or complex job instructions. The claimant could perform simple, repetitive tasks on a sustained basis (meaning eight hours a day, five days a week or an equivalent work schedule); no sudden or unpredictable workplace changes; cannot perform tasks requiring intense or focused attention for prolonged periods; and work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities, or pace of work). Socially, he can have only occasional interactions with the general public.

(Tr. 21). The ALJ explained that in considering Godsey's symptoms he followed a two-step process. (Tr. 21). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Godsey's pain or other symptoms. (Tr. 21). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Godsey's functioning. (Tr. 21).

Godsey was forty-one years old, single, and lived with a friend. (Tr. 21). Godsey indicated that his main physical problems were back pain, headaches, and feet and right elbow problems. (Tr. 22). He reported trouble bending, twisting, and standing. (Tr. 22). Godsey testified that his doctor informed him that his pain could not be alleviated and that his doctor did not recommend surgery. (Tr. 22). He stated that his pain level was "eight out of ten," that he had right elbow pain, that he had spots on the middle of his foot below his toes, and numbness and sharp pains in his feet. (Tr. 22).

Godsey testified that he could walk only for five to ten minutes and that his ability to stand was worse. (Tr. 22). He reported that he took medicine for acid reflux previously but had not taken any medication for two months. (Tr. 22). The ALJ noted that Godsey's behavior at the hearing did not demonstrate major pain. (Tr. 22). For example, Godsey did not leave his

seat, sat still through most of the hearing, did not have a limited gait, and did not walk or stand abnormally. (Tr. 22).

The ALJ concluded that Godsey received minimal treatment based on the medical evidence. (Tr. 22). Godsey received free or low-cost treatment at the Kenny Burkett Clinic, where he complained of ongoing abdominal pain. (Tr. 22). However, his testing was within normal limits and no objective findings were consistent with the severity of his complaints. (Tr. 22). Godsey was told to have an MRI for his headaches, but he could not afford it. (Tr. 22). Godsey had a fatty liver, was not diabetic, and was not at risk for diabetes. (Tr. 22). The clinic prescribed Flexeril for Godsey's back pain and Zantac for his GERD problems. (Tr. 22). Additionally, the clinic ordered a podiatry consultation for Godsey's foot pain, but the ALJ did not find a record for that appointment. (Tr. 22).

A gallbladder ultrasound revealed a fatty infiltration of Godsey's liver, and a CT scan showed a small, noncalcified left lower lobe pulmonary nodule. (Tr. 22). Therefore, the doctor recommended a follow up CT scan six months later. (Tr. 22). Godsey also received treatment for pilonidal sinus and colitis. (Tr. 22). The doctor offered an excision under local anesthesia, and Godsey indicated that he would consider the operation and schedule an appointment. (Tr. 22). An April 29, 2011, lumbar spine x-ray demonstrated mild degenerative changes. (Tr. 22). While a March 22, 2013, lumbar spine x-ray revealed early degenerative disc changes at L5-S1. (Tr. 22). Godsey's L5-S1 disc space had early thinning and his sacroiliacs were not well visualized, but he did not have any fractures or dislocations. (Tr. 22).

Godsey told Dr. Kamineni that he did not sleep well, denied having a CT or MRI of his brain for headaches, denied having a neck x-ray, and reported a normal colonoscopy and EGD. (Tr. 22–23). Despite finding that Godsey had abnormal joint movement, Dr. Kamineni

5

concluded that he had no muscle pain, no tenderness to palpation in his lumbosacral spine, and normal heel toe and tandem walking. (Tr. 23). The ALJ found that Godsey had chronic low back pain, chronic foot pain without deformity, and chronic headaches without neurological deficits. (Tr. 23). Godsey reported that he could lift and carry twenty pounds for short distances and could lift ten pounds over his head. (Tr. 23). Godsey also saw Dr. Coda, who evaluated his foot pain and found no calluses or foot sores. (Tr. 23).

On June 4, 2013, Dr. Fervida performed a consultative evaluation on Godsey. (Tr. 23). Godsey reported that his unemployment and homelessness increased his depression, that he felt overwhelmed, and that he experienced audible hallucinations. (Tr. 23). Godsey denied having manic symptoms. (Tr. 23). Dr. Fervida concluded that Godsey's mood and affect were flat and mildly depressed, that he had average persistence and insight, and that he could understand what he was doing. (Tr. 23). However, Dr. Fervida found Godsey's understanding below average and concluded that Godsey's poor recognition demonstrated that more than his depression affected his memory. (Tr. 23). Dr. Fervida assessed Godsey's GAF as 42. (Tr. 23). The ALJ did not give Dr. Fervida's low GAF score great weight. (Tr. 23). Despite Dr. Fervida's low GAF assessment, the ALJ noted that Godsey could perform simple repetitive tasks on a sustained basis, he could understand and follow instructions normally, and his concentration and frustration tolerance was average. (Tr. 23).

The ALJ found that Godsey's medically determinable impairments reasonably could cause the alleged symptoms, but he found Godsey incredible regarding the intensity, persistence, and limiting effects of the symptoms. (Tr. 23). The ALJ stated that neither the medical evidence nor the medical opinions demonstrated that Godsey could not work. (Tr. 23). In considering Godsey's credibility, the ALJ indicated that he considered Godsey's daily living activities, his

6

treatment, and the type, dosage, effectiveness, and side effects of his medication. (Tr. 23). The ALJ also noted that his conclusion was consistent with the State Agency physicians and psychologists with some alterations. (Tr. 24). For example, the physicians found that Godsey could perform a limited range of light work, and the psychologists concluded that Godsey had three moderate restrictions under the Paragraph B criteria. (Tr. 24).

At step four, the ALJ determined that Godsey could not perform his past relevant work. (Tr. 24). Considering Godsey's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that he could perform, including electrical accessories assembler (175 jobs regionally, 2,000 jobs in Indiana, and 100,000 jobs nationally), folder (100 jobs regionally, 3,000 jobs in Indiana, and 200,000 jobs nationally), and electronics worker (175 jobs regionally, 2,000 jobs in Indiana, and 100,000 jobs nationally). (Tr. 24–25).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence."); *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852

7

(1972) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see Bates*, 736 F.3d at 1098; *Pepper*, 712 F.3d at 361–62; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Rice v. Barnhart*, 384 F.3d 363, 368–69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the

8

impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Godsey has argued that the ALJ's credibility finding was patently wrong. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. ***Bates v. Colvin***, 736 F.3d 1093, 1098 (7th Cir. 2013); ***Schmidt v. Astrue***, 496 F.3d 833, 843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate

courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098.

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. § 404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. § 404.1529(c);** *see Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1; *see Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) ("'[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.'") (quoting *Indoranto*,

374 F.3d at 474); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2; *see Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015) ("[A] failure to adequately explain his or her credibility finding by discussing specific reasons supported by the record is grounds for reversal.") (citations omitted); *Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). A

11

minor discrepancy, coupled with the ALJ's observations is sufficient to support a finding that the claimant was incredible. *Bates*, 736 F.3d at 1099. However, this must be weighed against the ALJ's duty to build the record and not to ignore a line of evidence that suggests a disability. *Bates*, 736 F.3d at 1099.

Godsey has argued that the ALJ's credibility finding was patently wrong. He has claimed that the ALJ relied on the "sit and squirm" standard, which provided little probative value. The ALJ indicated that Godsey's behavior at the hearing did not demonstrate that he was in major pain. The ALJ noted that he did not get up from his seat, that he sat through most of the hearing, that his gait was not limited, and that he walked and stood normally. At the hearing, Godsey testified that he was in pain and indicated that he remained seated only because of the hearing. Godsey has questioned the ALJ's observations because the ALJ presided over the hearing via a video monitor.

Godsey also has argued that the ALJ incorrectly drew a negative inference from his minimal treatment. The ALJ stated that Godsey received minimal treatment from a free or low-cost health clinic. Additionally, he noted that Godsey failed to follow up on occasion. Godsey has claimed that he attempted to receive consistent treatment, but he indicated that he could not afford treatment due to his unemployment, homelessness, and lack of health insurance. Godsey has argued that he followed through on all treatment he could afford. Therefore, the ALJ should not have drawn a negative inference from his minimal treatment.

Finally, Godsey has claimed that the ALJ erred by finding him incredible based on his daily living activities. Godsey noted Dr. Fervida's opinion, which concluded that he was substantially impaired and that he needed assistance to complete his daily living activities. Additionally, Godsey has argued that his activities were necessary for survival and that they did

not demonstrate an ability to perform substantial gainful activity. He has opined that the ALJ failed to explain how his daily living activities contradicted his assertions.

The Commissioner has argued that the ALJ considered Godsey's demeanor, treatment, and daily living activities properly. She has indicated that the ALJ could consider Godsey's demeanor at the hearing and that the ALJ did not place undue emphasis on his observations. The Commissioner has argued that the ALJ did not draw a negative inference based on Godsey's minimal treatment, rather he only was commenting on Godsey's lack of treatment without finding him less credible. However, the Commissioner also has argued that the objective medical evidence did not support Godsey's allegations.

The ALJ's credibility finding was patently wrong. Although the Commissioner has argued that the ALJ did not draw a negative inference based on Godsey's minimal treatment, the ALJ did hold Godsey's minimal treatment against him. The ALJ cited Godsey's minimal treatment as part of his credibility assessment without further explanation. On its face, it appears that the ALJ drew a negative inference based on Godsey's minimal treatment. However, the ALJ failed to explain why Godsey received only minimal treatment. Godsey indicated that he could not afford additional treatment. Therefore, the ALJ should not have drawn a negative credibility inference from Godsey's minimal treatment. *See* S.S.R. 96-7p, 1996 WL 374186, at *7; ***Shauger v. Astrue***, 675 F.3d 690, 696 (7th Cir. 2012).

Additionally, the ALJ failed to explain his credibility finding adequately. He stated that he considered Godsey's daily living activities, treatment, and medications when discounting Godsey's credibility. (Tr. 23). However, the ALJ provided no explanation for why Godsey's daily living activities, treatment, or medications contradicted his allegations. The ALJ failed to build a logical bridge from the evidence to his conclusion. Moreover, the ALJ made a

13

conclusory statement about the objective medical evidence in support of his adverse credibility finding. The ALJ stated that the medical evidence and opinions did not support Godsey's allegations without further explanation. (Tr. 23). Although the ALJ did review the objective medical evidence, he failed to make explicit findings in support of his credibility determination. The ALJ did not explain how Godsey's subjective complaints contradicted the objective medical evidence.

Lastly, the ALJ used the "sit and squirm" test to support his adverse credibility finding. The ALJ indicated that Godsey did not demonstrate major pain at the hearing, that he did not leave his seat, that he sat through most of the hearing, that his gait was not limited, and that he walked and stood normally. The ALJ should consider Godsey's demeanor when assessing his credibility. However, the Seventh Circuit has questioned the "sit and squirm" test. *See* ***Powers v. Apfel***, 207 F.3d 431, 436 (7th Cir. 2000) ("We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort."). But the "sit and squirm" test alone does not render a credibility finding patently wrong. ***Powers***, 207 F.3d at 436.

Godsey testified at the hearing that he was in pain throughout the hearing and that he remained seated only because of the hearing. (Tr. 53). The ALJ did not address Godsey's testimony. Therefore, it was not clear why the ALJ rejected Godsey's explanation for his lack of observable pain or discomfort. Without an explanation of Godsey's testimony, the probative value of the ALJ's observations are questionable.

Considering the ALJ's failure to explain his findings and Godsey's testimony, the ALJ did not build an accurate and logical bridge from the evidence to his credibility finding. The ALJ should provide more than a conclusory statement and explain why the objective medical

14

evidence, Godsey's daily living activities, and his treatment contradicted his allegations. Additionally, he should indicate whether he accepted or rejected Godsey's testimony about his pain throughout the hearing and why he remained seated. Therefore, the ALJ's credibility finding was patently wrong requiring remand.

Next, Godsey has argued that the ALJ failed to include limitations in his RFC assessment. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not

support her conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Godsey has argued that the ALJ failed to include limitations in the RFC based on his memory limitations, foot pain, and headaches. First, Godsey has claimed that the ALJ failed to account for the memory limitations found by Dr. Fervida. Dr. Fervida concluded that Godsey had a significant memory impairment, a significant recognition impairment, and a major visual memory deficit. (Tr. 312). Furthermore, he found that Godsey would have significant difficulty with assembly tasks and that Godsey needed support to accomplish his daily tasks. (Tr. 312). Dr. Fervida also stated that Godsey's ability to complete his daily tasks would be substantially impaired. (Tr. 312).

The ALJ rejected Dr. Fervida's GAF finding of 42 but did not identify whether he accepted the remainder of Dr. Fervida's conclusions. Ultimately, the ALJ found that Dr. Fervida's opinion supported an ability to perform simple, routine tasks because Dr. Fervida found that Godsey could understand and follow instructions adequately and that Godsey had average concentration and frustration tolerance. However, the ALJ did not explain how Godsey's significant memory impairments affected his ability to work.

The Commissioner has argued that the ALJ considered and accounted for Godsey's memory limitations. She noted that the ALJ reviewed Dr. Fervida's opinion and Dr. Gange's opinion, which concluded that Godsey could perform simple, routine tasks. The Commissioner further has argued that the ALJ accounted for Godsey's memory impairment by limiting him to

16

simple, routine tasks, restricting intense or attention demanding tasks, and requiring a flexible pace.

It is clear that the ALJ considered Dr. Fervida's opinion, including the finding of significant memory impairments. However, the ALJ could have further discussed Dr. Fervida's findings. The ALJ did not explain why Godsey's significant memory impairments did not affect his ability to perform simple, routine tasks. Considering that Dr. Fervida concluded that Godsey's memory significantly impaired his ability to perform his simple daily living activities, the ALJ should have discussed Dr. Fervida's findings. The ALJ did not need to discuss every piece of evidence, but he needed to discuss evidence that undermined his ultimate conclusions. *Moore*, 743 F.3d at 1123. Dr. Fervida's opinion undermined the ALJ's conclusion that Godsey could perform simple, routine tasks. Therefore, the ALJ should have explained why he rejected Dr. Fervida's opinion. Godsey also has argued that the ALJ should have included his memory impairments in the hypotheticals asked to the VE. Because this court has found that the ALJ should further discuss Dr. Fervida's opinion on remand, the ALJ also should consider whether to include Godsey's memory limitations in any hypotheticals.

Godsey has claimed that the ALJ also failed to account for his foot pain and headaches in the RFC. The ALJ found that Godsey's foot pain and headaches were severe impairments, but he did not include any limitations based on those impairments in the RFC. Furthermore, the ALJ did not explain why he did not include any limitations based on those impairments. Dr. Kamineni concluded that Godsey could stand only for thirty minutes and could walk only for six minutes. (Tr. 306). Additionally, he noted that Godsey had chronic foot pain. (Tr. 306). The ALJ reviewed Dr. Kamineni's opinion, but he did not discuss Dr. Kamineni's standing and walking limitations. Because the ALJ did not include any standing or walking limitations in the

17

RFC, Dr. Kamineni's opinion undermines his ultimate conclusion. Therefore, the ALJ should have confronted that evidence and explained why it was rejected.

Similarly, the ALJ did not discuss how Godsey's headaches affected his ability to work. Godsey's headaches were documented in the medical record, and Dr. Fervida suggested that a possible organic source could have increased Godsey's headaches. Considering that this matter is being remanded on a separate issue, the ALJ may further consider Godsey's headaches on remand. Additionally, the ALJ may determine whether to include limitations based on Godsey's foot pain and headaches in the hypotheticals posed to the VE on remand.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED**.

ENTERED this 16th day of December, 2015.

/s/ Andrew P. Rodovich
United States Magistrate Judge